# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  **ADAM BOWSER.**<br><br>    Debtor | Chapter 7 Case No. 20-10015 |
| **FEDERAL TRADE COMMISSION,**<br><br>    Plaintiff,<br><br>               v.<br><br>**ADAM BOWSER,**<br><br>    Defendant. | Adv. Proceeding No. 20-_____<br><br>**COMPLAINT FOR NONDISCHARGEABILITY OF DEBT OWED TO FEDERAL TRADE COMMISSION** |

The Federal Trade Commission ("FTC" or "Commission") brings this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A) and (c), seeking an order determining that a judgment obtained by the Commission against Defendant Adam Bowser ("Bowser" or "Debtor" or "Defendant") is excepted from discharge.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2.      Venue in the District of Massachusetts is proper under 28 U.S.C. § 1409(a).

3.      This Adversary Proceeding relates to *In re Adam Bowser*, Bankr. Case No. 20-10015 (Bankr. D. Mass.) now pending in this Court (the "Bankruptcy Case").  The FTC is a creditor with an unsecured claim against Debtors pursuant to a Stipulated Order for Permanent Injunction and Monetary Relief As to Defendants Adam S. Bowser, et al. (the "Stipulated Judgment"), entered in the United States District Court for the District of Nevada in the case

styled *Federal Trade Commission v. AWS, LLC, et al.*, Case No. 2:18-CV-00442-JCM-PAL (the "Enforcement Action").  A copy of the Stipulated Judgment is attached and incorporated as **Exhibit 1**.

4.      The Stipulated Judgment includes equitable monetary relief in favor of the FTC and against Debtor and his Enforcement Action co-defendants, jointly and severally, in the amount of $102,481,596.  Ex. 1, Section III.

5.      As part of the Stipulated Judgment, Debtor agreed that the Stipulated Judgment would be excepted from discharge pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A). Ex. 1, Section III.K-L.  Debtor further stipulated that the facts alleged in the District Court Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the FTC to enforce its rights to any payment or monetary judgment under the Stipulated Judgment. A copy of the District Court complaint is attached as **Exhibit 2** (the "District Court Complaint").

6.      Plaintiff FTC consents to entry of a final judgment by the Court in this proceeding.

### THE PARTIES

7.      Plaintiff FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The Commission is charged with, *inter alia*, enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  In addition, the FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437.  The Business Opportunity Rule addresses common deceptive or unfair practices engaged in by fraudulent business opportunity sellers such as inducing consumers to pay significant sums of money by means of false or unsubstantiated earnings claims.

2

8.      The FTC is authorized to initiate federal district court proceedings, by its own

attorneys, to enjoin violations of the FTC Act and the Business Opportunity Rule, and to secure

such equitable relief as may be appropriate in each case, including rescission or reformation of

contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15

U.S.C. §§ 53(b) and 56(a)(2)(A), 56(a)(2)(B), 57b, and the Business Opportunity Rule, 16 C.F.R.

Part 437.

9.      Bowser is the debtor in the Bankruptcy Case now pending before this Court.

10.     Plaintiff incorporates by reference herein all allegations set forth in the District

Court Complaint.

## COURSE OF PROCEEDINGS AND DEBTORS' CONDUCT
## GIVING RISE TO THE NON-DISCHARGEABLE DEBT

11.     Since at least 2014 until at least the date the District Court Complaint was filed,

Defendant and his Enforcement Action co-defendants advertised, marketed, distributed,

promoted and sold business opportunities to consumers throughout the United States.

12.     Defendant and his Enforcement Action co-defendants marketed their business

opportunities under multiple brand names including: AWS, Amazon Wealth Systems, Amazing

Wealth Systems, FBA Stores, Insider Online Secrets, Online Auction Learning Center, and

Online Seller (collectively the "Amazing Wealth System").

13.     Defendant and his Enforcement Action co-defendants offered the Amazing

Wealth System to consumers through a variety of marketing mediums including direct mail,

radio, Internet websites, videos disseminated online through YouTube, social media such as

Facebook, webinars, and live events.

14.     Defendant and his Enforcement Action co-defendants widely disseminated their

advertising for the Amazing Wealth System throughout the United States.

3

15.     Defendant and his Enforcement Action co-defendants promoted the Amazing Wealth System in multiple languages including English and Spanish.

16.     Defendant and his Enforcement Action co-defendants made earnings claims in connection with the offer for sale, sale, and promotion of the Amazing Wealth System.

17.     In their advertising, Defendant and his Enforcement Action co-defendants represented that consumers who purchased and deployed the Amazing Wealth System were likely to profit by selling products on Amazon.com.

18.     Typical representations made in this advertising include the following (all capitalization and punctuation original):

A.     My name is Adam Bowser, and over the past 18 years I have sold over $50 million online.  I'm going to be hosting a few local workshops around the Seattle area to share my secrets for making money on Amazon.  This will truly be a once-in-a-lifetime opportunity.

B.     Get started selling on Amazon and Make $5,000-$10,000 in the next 30 days…Even if you have never sold anything online before.

C.     I'll be Giving you Wholesalers You can call up and Get Great Deals for Huge profits. Or just make some extra $$ to Pay Your Basic Bills.

D.     For years we have been helping thousands of ordinary people take their lives back and create financial freedom by implementing our systems for success on Amazon.

E.     Just last year we sold over $12 Million on Amazon.com.  Now we want to help you become our next Amazon success story.

19.     Defendant and his Enforcement Action co-defendants earnings claims regarding the Amazing Wealth System were false or unsubstantiated.

4

20.     Few, if any, consumers who purchased the Amazing Wealth System earned the income Defendant and his Enforcement Action co-defendants advertised.  Most, if not all, purchasers did not earn any income whatsoever with the Amazing Wealth System.

21.     Defendant and his Enforcement Action co-defendants disseminated industry financial, earnings, or performance information in connection with the offer for sale, sale, and promotion of the Amazing Wealth System while lacking written substantiation demonstrating that the information reflected, or did not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the Amazing Wealth System.

22.     For example, in late July 2017, during a live event promoting the Amazing Wealth System held at the Carson Nuggets Casino Hotel in Carson City, Nevada, Defendant and his Enforcement Action co-defendants presented consumers with an "Amazon Workshop Manual" containing industry performance information showing, among other e-commerce industry statistics, millions of monthly U.S. visitors across retail websites, increasing e-commerce sales of the largest U.S. internet retailers, including Amazon, and a high average growth rate in e-commerce.  This industry information left consumers with the impression that they were likely to earn significant income if they purchased and implemented the Amazing Wealth System.  The industry performance information contained in the "Amazon Workshop Manual" exceeded, or did not reflect, the performance experience of typical purchasers of the Amazing Wealth System.

**Amazon's Third-Party Seller Program**

23.     Amazon.com is a popular website owned and operated by Amazon.com, Inc. ("Amazon").  Millions of consumers use Amazon.com every day to purchase a wide range of products, across dozens of product categories, from Amazon and its authorized third-party sellers.

24.     Amazon's third-party seller program provides registered sellers access to Amazon's customer-base, Internet outlets, and other benefits.

25.     To sell products on Amazon.com, third-party sellers must create a "Selling on Amazon" account ("Amazon Selling Account") using Amazon's Seller Central, the Web interface where third-party sellers open and manage their Internet outlet or "Amazon Store."

26.     When they open their Amazon Selling Account, third-party sellers must agree to the Amazon Services Business Solutions Agreement ("Amazon BSA"), which governs access to, and use of, Amazon's services and sets forth Amazon's rules and restrictions for selling on Amazon.com.

27.     After opening an Amazon Selling Account, selling on Amazon.com involves three main steps:  (1) listing products; (2) selling the products; and (3) shipping the products to consumers.

28.     The first step in selling a product on Amazon.com requires the third-party seller to create a listing accurately identifying the product for sale.  Each product sold is assigned a unique Amazon Standard Identification Number ("ASIN").  Pursuant to the Amazon BSA, product listings must be "accurate and complete."

29.     After a product is listed, it becomes available for purchase on Amazon.com.

30.     Products listed for sale on Amazon.com appear on a product detail page, which customers typically reach after searching for a product or category of products.  The product detail page includes a "Buy Box" where a listing is given prominence and where customers can quickly begin the purchasing process by adding items to their electronic shopping carts.  A screenshot of an Amazon.com product detail page with the "Buy Box" labeled in red appears below:

6



31.     Multiple sellers can offer the same product on Amazon.com.  If more than one eligible seller offers a product, they may compete for the Buy Box for that product.  Third-party sellers must meet certain performance-based requirements and metrics (e.g., order defect rate, chargeback rate, speed of delivery, and experience with the Amazon selling service) to be eligible to compete for Buy Box placement.  For many third-party sellers, Buy Box placement can lead to increased sales.

32.     Amazon encourages its customers to review the products they purchase and publishes customer reviews on product detail pages accessible from product listings on

Amazon.com.  To review a product, an individual must be an Amazon.com customer and must have an Amazon.com customer account.

33.     Amazon expressly prohibits paid reviews and has developed technologies and protocols designed to detect and remove false, misleading, and inauthentic reviews from Amazon.com.  Amazon routinely suspends third-party sellers that post or purchase fake reviews and has taken legal action against parties who offered to supply paid reviews on Amazon.com.

34.     Once a customer places an order on Amazon.com, Amazon notifies the third-party seller.  Orders are then fulfilled in one of two ways:  (1) by the third-party seller itself; or (2) by Amazon, if the third-party seller is using Amazon's "Fulfillment by Amazon" ("FBA") service.

35.     Amazon offers third-party sellers the option of fulfilling orders through its FBA service.  With the FBA service, third-party sellers can ship their products to one of the Amazon fulfillment centers located around the country and Amazon will pick, pack, and ship these products to the end customer.  Products offered through Amazon's FBA service are displayed with Amazon's Prime logo, indicating to customers that Amazon itself handles the shipping and customer service.  Products shipped from Amazon's fulfillment centers are also eligible for Amazon Prime free two-day shipping for Prime members and free shipping for all customers. Amazon also provides customer service for these products, handling questions, complaints, returns, and refunds.

36.     Certain product categories are "gated" on Amazon.com (e.g., collectible coins, fine art, sexual wellness, and wine), which means that third-party sellers must obtain approval from Amazon before listing products in these restricted product categories.  The process of approving third-party sellers to sell gated products is commonly referred to as "ungating."

8

Amazon's ungating requirements vary by category and are generally designed to ensure that third-party sellers and their products are reliable and genuine.

### Defendants' Amazing Wealth System

37.     Defendant and his Enforcement Action co-defendants are not affiliated with, or connected to, Amazon in any way.

38.     Defendant and his Enforcement Action co-defendants solicited prospective purchasers to enter into a new business using the Amazing Wealth System to sell products as third-party sellers on Amazon.com.

39.     Defendant and his Enforcement Action co-defendants described the Amazing Wealth System as an exclusive "plug-and-play system" to assist purchasers in launching and growing a new online business selling products as a third-party seller on Amazon.com.

40.     Defendant and his Enforcement Action co-defendants required prospective purchasers to make a payment to purchase the Amazing Wealth System.

41.     Defendant and his Enforcement Action co-defendants represented that they or one or more designated persons, including Amazon, will provide prospective purchasers of the Amazing Wealth System the following:

A.     An Internet outlet in the form of one or more Amazon stores or accounts where prospective purchasers will be able to sell products as third-party sellers on Amazon.com;

B.     Assistance to get up and running on Amazon.com;

C.     Access to wholesalers and major suppliers;

D.     Storage, handling, packing, labeling, shipping, and inventorying of products to sell on Amazon.com;

E.      Exclusive access to authentic products likely to sell at "healthy" profit margins on Amazon.com;

F.      "Tips, tricks, and techniques" to profit and out compete other third-party sellers on Amazon.com; and

G.      Login access to the AWS Members Area, which is described as an online platform that includes step-by-step training videos, top tier wholesale suppliers that can supply purchasers with products for their online business, and tools and software to help purchasers automate, systematize, and grow their business.

42.      The price of the Amazing Wealth System ranged from $995 to more than $35,000 depending on what level of "enrollment" or "package" prospective purchasers chose and what "bonuses" they selected.

43.      For example, the base $995 Amazing Wealth System package provided Defendant and his Enforcement Action co-defendants' purported "tips, tricks, and techniques" through a three-day live workshop, videos, and webinars.  The higher level $34,995 "Diamond Enrollment" offered prospective purchasers "16 Personal 1 on 1 Coaching Sessions" and other purported "bonuses" such as ungating services in addition to the workshop, videos, and webinars offered with the base Amazing Wealth System package.

44.      During the personal coaching sessions, Defendant and his Enforcement Action co-defendants typically conveyed substantially similar strategies and content as Defendant and his Enforcement Action co-defendants' three-day live workshops, videos and webinars.

**Defendant and his Enforcement Action co-defendants' Deceptive Campaigns to Recruit Consumers to Attend Live Events**

45.    In an effort to lure consumers into purchasing the Amazing Wealth System, Defendant and his Enforcement Action co-defendants conducted free two-hour live events or "workshops."

46.    Defendant and his Enforcement Action co-defendants conducted live events throughout the United States and Canada including in: Austin, Texas; Baltimore, Maryland; Las Vegas, Nevada; Madison, Wisconsin; Milwaukee, Wisconsin; San Antonio, Texas; San Juan, Puerto Rico; Seattle, Washington; Louisville, Kentucky; Oakland, California; and Washington, DC.

47.    Defendant and his Enforcement Action co-defendants promoted their live events by targeting consumers that live near an upcoming live event.

48.    In October 2017, Defendant and his Enforcement Action co-defendants disseminated promotional materials, including direct mailers, to consumers in Nevada for a live event in Las Vegas.

49.    In November 2017, Defendant and his Enforcement Action co-defendants disseminated promotional materials, including direct mailers, to consumers in California's Bay Area.

50.    In September 2017, Defendant and his Enforcement Action co-defendants disseminated Spanish language promotional materials, including direct mailers, to consumers in Puerto Rico.

51.    Defendant and his Enforcement Action co-defendants' direct mail invitations typically urged consumers to call a toll-free number immediately and register to attend a free two-hour "exclusive LIVE Amazon Workshop" in their local area.

52.     Defendant and his Enforcement Action co-defendants' direct mail invitations typically offered the free two-hour workshops over 4-5 days at multiple hotels in the targeted area.

53.     Defendant and his Enforcement Action co-defendants' direct mail invitations typically included earnings claims such as "Get started selling on Amazon and Make $5,000-$10,000 in the next 30 days…Even if you have never sold anything online before."

54.     In addition to using direct mail, Defendant and his Enforcement Action co-defendants used email, social media and radio advertisements to promote their free two-hour workshops.

**Defendant and his Enforcement Action co-defendants' Free Two-Hour Workshops**

55.     During the free two-hour workshops, Defendant and his Enforcement Action co-defendants attempted to convince consumers to purchase their "system" and enroll in their "3-Day Amazon Profits Workshop," which they typically offered at a "special discount" of $995.

56.     Defendant and his Enforcement Action co-defendants made earnings claims throughout the free two-hour workshops and share examples and testimonials of purportedly successful purchasers of the Amazing Wealth System.

57.     For example, on July 7, 2017, "Skylar," one of Defendant and his Enforcement Action co-defendants' presenters, made the following oral representations during a free two-hour workshop held at the Renaissance Hotel in Seattle, Washington:

> A.     "How many of you would love to be able to learn how you can make an extra $5,000 to $10,000 a month by spending 30 minutes to an hour a day learning and implementing a plug-and-play system I'm going to share with you here in a moment."

12

B.      "You're selling Amazon, you're now making more money.  That means that whatever you have invested into inventory, whatever you start with, you've gotten that money back plus a what? … Plus a profit, or what is called an ROI, which stands for a return on investment…See, in our system – again, write this down – the minimum ROI, minimum net return on investment that our students are making right now, their target minimum net ROI, is 20 percent.  Write that down.  Twenty percent. Minimum net ROI of 20 percent."

C.      "All right, guys.  So what did John Bean do? … Took $1,000, turned it into … $65,000.  Now, do you think that John Bean stopped there?  …How many of you would not stop there by raise of hand.  See, here's what we know, folks.  You go to the three-day workshop, you learn the system, you start selling on Amazon, once you've made your first, second, third sale, what are you proving to yourself? … That you can do it, right, that you can do it. … So, again, like I said, John Bean started out with what – with $1,000, turned that into $65,000.  Now, by the way, we're going to talk about the time frame that John Bean did that in.  However, he was working on a very compressed time frame because he said I don't have five years, 10 years, to be able to build my retirement level up.  He says, I've got to do this now."

58.      In some instances, Defendant and his Enforcement Action co-defendants displayed an "earnings disclaimer" on a screen shortly after beginning their free two-hour workshops.  One such earnings disclaimer stated:

Any student examples showing profits or other earnings are NOT interpreted as Average [sic], or normal.  The typical, expected or normal individual does not

13

ever start a business.  So, by having a business at all, they are already above

average.  All profits shown are potential returns.  There is no assurance that your

profits and income will match what we present.

59.     In some instances, Defendant and his Enforcement Action co-defendants also

made oral earnings disclaimers during the course of the free two-hour workshops.  For example,

during a free two-hour workshop in Seattle, the presenter stated as follows:

Just because I share with you a testimonial or an example of someone that, let's

say, is making $10,000 a month, am I guaranteeing that you're also going to

make $10,000 a month? ... Absolutely not.

60.     Despite the brief earnings disclaimers, Defendant and his Enforcement Action co-

defendants' presentation during the free two-hour workshops left consumers with the net

impression that they are likely to profit implementing the Amazing Wealth System to sell on

Amazon.

61.     Defendant and his Enforcement Action co-defendants also told consumers who

attend the free two-hour workshops that it's not possible to teach them everything in two hours

and that to fully understand Defendant and his Enforcement Action co-defendants' system and

receive the necessary software "tools" and access to a network of wholesalers, consumers need

to purchase the Amazing Wealth System and attend Defendant and his Enforcement Action co-

defendants' "3-Day Amazon Profits Workshop" ("3-Day Workshop").

62.     Defendant and his Enforcement Action co-defendants typically offered the

Amazing Wealth System base package, which includes enrollment in a 3-Day Workshop, for

$995.

63.     The base Amazing Wealth System package also included, among other things, a set of books and DVDs bearing the label "Amazon Riches Home Study System."

64.     Defendant and his Enforcement Action co-defendants required consumers purchasing the Amazing Wealth System base package to sign a purchase order.

**Defendant and his Enforcement Action co-defendants' 3-Day Workshops**

65.     Defendant and his Enforcement Action co-defendants held 3-Day Workshops throughout the United States and Canada.

66.     Defendant and his Enforcement Action co-defendants typically held their 3-Day Workshops within a month of, and in close proximity to the location of, the free two-hour workshops.

67.     During the 3-Day Workshops, Defendant and his Enforcement Action co-defendants attempted to convince consumers to upgrade to more expensive enrollment levels of the Amazing Wealth System and buy additional products and services.

68.     Defendant and his Enforcement Action co-defendants typically offered "Diamond," "Platinum," and "Gold" enrollments for $34,995, $19,995, and $9,995 respectively.

69.     Defendant and his Enforcement Action co-defendants required consumers enrolling in a higher-level enrollment such as the "Platinum Enrollment" to sign a written agreement.

70.     Defendant and his Enforcement Action co-defendants' higher-level enrollments for the Amazing Wealth System typically featured "Personal 1-on-1 Coaching Sessions" and other "bonuses," such as ungating services and access to the "Fulfillment By Adam" service.

71.     Defendant and his Enforcement Action co-defendants' Fulfillment By Adam service purportedly received orders from wholesalers exclusively on behalf of purchasers of the Amazing Wealth System and packed and shipped those products to Amazon's fulfillment

centers.  According to Defendant and his Enforcement Action co-defendants, "this service is designed so that [purchasers] can focus on making more money…"

72.     During the course of the 3-Day Workshops, Defendant and his Enforcement Action co-defendants repeated, reinforced, and expanded on the earnings claims made in their initial advertising campaign and in the free two-hour workshop.  They did so through additional testimonials and specific examples designed to give prospective purchasers the impression that they would likely realize high profit margins using the Amazing Wealth System.

73.     For example, on December 8, 2017, Nathan Rossi, a presenter for Defendant and his Enforcement Action co-defendants, made the following oral representations during a 3-Day Workshop held at the Red Lion Hotel in Oakland, California:

A.      "I'm going to show you how to build a business to whatever size you want it to be online, on Amazon.  So whether you want an extra $20- to $30,000 a year or you want to create a million dollar a year business, I'm going to show you how to do either of those."

B.      "This is you starting a legitimate e-commerce business, right?  I'm going to show you some stuff this weekend that's going to blow your hair back a little bit.  I'm going to show you products that are going to give you ROI 50, 80, 100, 200, 500 percent return on your money."

C.      "You see, I regularly beat Amazon because I know how to win the buy box and I know their tricks.  And so I deploy the same tricks and I can actually win the buy box.  So we'll get into that."

D.      "Whether – you know, if you come to me and say, Nathan, I'm retired, I've got $250,000 to start this business, I've got great credit and all the time in the

world, well, great, we've got a plan for that.  If you come and you say, I work two

jobs, I'm a single mother, my credit score starts with a decimal point and I could

scrape together 500 bucks to get started, well, we've got a plan for that, too.  It's a

different plan and both plans will make money, but it's just different ways.  What

types of products should you start with, where do you begin, you know, what

niches do you start with, what categories, things like that."

74.     During the 3-Day Workshops, Defendant and his Enforcement Action co-
defendants also provided consumers with "tips, tricks, and techniques" to purportedly profit and
outcompete other third-party sellers on Amazon.com.

75.     Much of the information Defendant and his Enforcement Action co-defendants
conveyed to consumers during the 3-Day Workshops, in their videos and webinars, and during
coaching sessions is basic information regarding Amazon.com and Amazon's FBA service that
is available free of charge on the "Resources and Tutorials" section of the Amazon services
website.

76.     Many of the strategies and techniques Defendant and his Enforcement Action co-
defendants urged consumers to deploy are deceptive and violate the Amazon BSA.

77.     For example, Defendant and his Enforcement Action co-defendants instructed
purchasers of the Amazing Wealth System to obtain fraudulent or fake product reviews for the
products purchasers list on Amazon.com.  The posting of fraudulent reviews by third-party
sellers violates Amazon's Anti-Manipulation Policy for Customer Reviews.

78.     Defendant and his Enforcement Action co-defendants instructed purchasers of the
Amazing Wealth System to obtain and deploy multiple Amazon Selling Accounts through a
variety of ruses in an effort to "win the Buy Box" over other third-party sellers.  Amazon strictly

prohibits third-party sellers from using multiple seller accounts without express permission from Amazon.

79.     Amazon prohibits third-party sellers from listing counterfeit or inaccurately described products on Amazon.com.  Nevertheless, in many instances, Defendant and his Enforcement Action co-defendants or their wholesalers sell counterfeit or inaccurately described products to purchasers of the Amazing Wealth System.  As a result, many purchasers, especially those relying on the Fulfillment By Adam service, listed counterfeit or inaccurately described products on Amazon.com, thus violating Amazon's BSA.

80.     According to an internal analysis conducted by Amazon, purchasers of the Amazing Wealth System "are more likely than other third party sellers on Amazon to experience problems with their Amazon seller accounts."  *See* Complaint, *Amazon.com, Inc. v. FBA Stores, LLC et al.*, Case No. 2:17-cv-01830-JPD (W.D. Wash. filed Dec. 6, 2017) (ECF No. 1) at 36, ¶ 131.  More than a quarter of the Amazing Wealth System third-party seller accounts identified by Amazon "have received warnings from Amazon or been suspended, including for possible trademark infringement, suspicion of product review abuse, poor delivery performance, high order defect rates, or other violations of Amazon's BSA and incorporated Seller policies."  *Id.*  The Amazing Wealth System third-party seller accounts identified by Amazon "have also performed worse than other Amazon sellers, as demonstrated by their higher-than-average rate of customer returns and lower average sales volume and revenue."  *Id.*

81.     Contrary to Defendant's and his Enforcement Action co-defendants' representations, consumers who purchased the Amazing Wealth System and attempted to deploy the strategies conveyed during the 3-Day Workshops, in Defendant and his Enforcement Action

co-defendants' videos and webinars, and during the personal coaching sessions are unlikely to earn the income that Defendant and his Enforcement Action co-defendants advertise.

**Debtor is Collaterally Estopped from Relitigating the Facts Above**

82.     Debtor was a party to the Enforcement Action and had the opportunity to litigate it.

83.     The Enforcement Action against Debtor ended after the District Court entered the Stipulated Judgment.

84.     The allegations in this Complaint are derived from the District Court Complaint, and the Stipulated Judgment entered against Debtor and his Enforcement Action co-defendants holding him jointly and severally liable in the amount of $102,481,596.

85.     The District Court's findings satisfy all elements necessary to establish a nondischargeable fraud claim under 11 U.S.C. § 523(a)(2)(A).  Thus, all of the issues raised in this nondischargeability action were previously litigated in the Enforcement Action.

86.     Accordingly, Debtor is collaterally estopped from relitigating the facts alleged in this Complaint.

## COUNT I

### (NON-DISCHARGEABILITY OF FINAL JUDGMENT)

87.     The Commission repeats and realleges the allegations in ¶¶ 1 through 86.

88.     Debts for money, property, or services obtained by false pretenses, a false representation or actual fraud are not dischargeable.  11 U.S.C. § 523(a)(2)(A).

89.     Debtor's misrepresentations in marketing and selling of a business opportunity were false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and the Business Opportunity Rule 16 C.F.R. Part 437.

90.     Debtor conducted the activities described in ¶¶ 11-86 with knowledge of the falsity or deceptiveness of his conduct or with reckless disregard for the truth of his conduct, and with an intent to deceive consumers.

91.     Debtor injured consumers by knowingly engaging in a fraudulent scheme and knowingly making false representations to consumers and using false pretenses in dealing with consumers.  These false representations and false pretenses were material to consumers in the course of deciding to purchase products and services offered by Debtor and his Enforcement Action co-defendants.  Consumers' reliance on Debtor's representations was justifiable.

92.     The total amount of money obtained from consumers by such false pretenses, false representations, or actual fraud is at least $102,481,596, the monetary portion of the Stipulated Judgment entered against Debtors in the Enforcement Action.

93.     Consequently, the Stipulated Judgment is a debt owed to the FTC for money, property, or services obtained by false pretenses, false representations, or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**WHEREFORE,** Plaintiff FTC requests that the Court:

(a)     Determine that:  (1) Debtor is collaterally estopped from relitigating the facts alleged in this complaint, and (2) the pre-petition debt owed by Debtor to the FTC pursuant to the Stipulated Judgment entered by the United States District Court for the District of Massachusetts, in the case styled *Federal Trade Commission v. AWS, LLC, et al.*, Case No. 2:18-CV-00442-JCM-PAL, in the principal amount of $102,481,596, plus applicable interest pursuant to 28 U.S.C. § 1961, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

(b)     Enter judgment holding Debtor's debt to the FTC is not discharged; and

(c)      Grant the FTC such other and further relief as this case may require and the Court

deems just and proper.

Date:  June 11, 2020                              Respectfully submitted by:


                                                 /s/  Katherine Johnson
                                                 Katherine Johnson (DC 497321)
                                                 Federal Trade Commission
                                                 600 Pennsylvania Ave., NW
                                                 Washington, DC 20580
                                                 Tel.:  (202) 326-2185;
                                                 Email: kjohnson3@ftc.gov
                                                 Facsimile:  (202) 326-3197

                                                 **_Attorney For Federal Trade Commission_**